## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ODUS ROSS, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>FIAT CHRYSLER AUTOMOBILES N.V., SERGIO MARCHIONNE, RICHARD K. PALMER, and REID BIGLAND,<br><br>                    Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Odus Ross ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Fiat Chrysler Automobiles N.V., and its predecessor companies, ("FCA" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Fiat; and (c) review of other publicly available information concerning Fiat.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that acquired FCA's, and its predecessor companies', securities between October 16, 2013, and July 18, 2016, inclusive (the "Class Period"), against the Defendants, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      FCA and its subsidiaries have historically engaged in the design, production and sales of automobiles. The Company operates through a variety of brands across the globe, including Abarth, Alfa Romeo, Chrysler, Dodge, Fiat, Fiat Professional, Jeep, Lancia, and Ram brands.

3.      In 2009 the Fiat Group, a predecessor company to FCA, and the Chrysler Group, LLC entered into a global strategic alliance. According to the Company, "that alliance grew in strength and scope over the following years, and Fiat obtained additional interests in Chrysler, leading to consolidation of Chrysler's results into the Fiat Group's financial statements from June 1, 2011. By January 2012, following achievement of three performance events by Chrysler and the acquisition of interests held by the U.S. Department of the Treasury and Canadian government, the [Fiat] Group's ownership interest in Chrysler reached 58.5 percent."

4.      In January 2014, the Fiat Group agreed to purchase the remaining 41.5% of Chrysler Group, LLC that it did not already own. And, in the summer of

2014, the Fiat Group announced plans to reorganize its assets and subsidiaries to effect two major changes: 1) domicile in the Netherlands; and 2) move the Fiat Group's primary listing to the NYSE. To effect these changes the Company announced a transaction whereby the Fiat Group would merge into Fiat Investments N.V. ("FCA"), a Netherlands company, and all investors that held Fiat Group common shares would receive one share of FCA.

5.     The merger closed on or around October 14, 2014, and on that date Fiat Group shareholders, including investors that held Fiat ADRs, received one share of FCA. FCA shares are traded on the New York Stock Exchange under the ticker "FCAU".

6.     Unbeknownst to investors during the reorganization of Fiat Group into FCA, and continuing throughout 2015 and 2016, the Company misled investors regarding a core metric, FCA's monthly vehicle sales numbers and allegedly claimed a record setting consecutive U.S. monthly vehicle sales growth.

7.     The truth began to emerge on or around January 12, 2016, when a FCA car dealer filed a lawsuit accusing the Company of improperly inflating vehicle sales numbers by reporting unsold vehicles as sold and then reversing those sales during the following month.

8.     Following the news reports of the FCA dealer lawsuit, the Company shares declined $0.66 per share, or more than 8%, to close at $7.53 per share on

January 14, 2016.

9.    Then on July 18, 2016, several media outlets reported that both the Department of Justice and the Securities and Exchange Commission ("SEC") were investigating FCA's sales practices. And, on July 18, 2016, FCA issued a press release announcing its cooperation with the SEC and DOJ, "FCA confirms that it is cooperating with the SEC investigation into the reporting of vehicle unit sales to end customers in the U.S. In its annual and quarterly financial statements, FCA records revenues based on shipments to dealers and customers and not on reported vehicle unit sales to end customers. Inquiries into similar issues were recently made by the U.S. Department of Justice. FCA will cooperate fully with these investigations."

10.    And, shortly thereafter on July 26, 2016, FCA announced that it had adjusted the way it discloses monthly U.S. vehicle sales, professing that the Company's "75-month streak of U.S. monthly vehicle sales growth" was false and actually ended at 40 months in September 2013.

11.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company had not achieved the sales growth originally communicated to investors; (2) that

the Company did not in fact achieve a 75 month streak of monthly vehicle sales growth (on a year over year basis); and (3) that, as a result of the foregoing, Defendants' statements about FCA's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

16.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

17.    Plaintiff Odus Ross, as set forth in the accompanying certification, incorporated by reference herein, purchased FCA common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.    Defendant FCA is a Dutch corporation headquartered in London, UK. FCA's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "FCAU."

19.    Defendant Sergio Marchionne ("Marchionne") is and, throughout the Class Period, was the Company's Chief Executive Officer.

20.    Defendant Richard K. Palmer ("Palmer") is and, throughout the Class Period, was the Company's Chief Financial Officer.

21.    Defendant Reid Bigland ("Bigland") is and, throughout the Class Period, was the Company's Head of U.S. Sales.

22.    Defendants Marchionne, Palmer and Bigland (collectively the "Individual Defendants"), because of their positions with the Company, possessed

the power and authority to control the contents of FCA's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

23.    FCA and its subsidiaries engage in the design, production and sale of automobiles. The Company operates through a variety of brands across the globe, including Abarth, Alfa Romeo, Chrysler, Dodge, Fiat, Fiat Professional, Jeep, Lancia, and Ram brands. Throughout the Class Period, FCA placed emphasis on the sales growth in the U.S. market.

**Materially False and Misleading**
**Statements Issued During the Class Period**

24.     The Class Period begins on October 16, 2013, on that day Fiat SpA (the predecessor to FCA) filed a Monthly Report with the SEC.  Therein, the Company reported monthly sales for September 2013, and announced total sales of 1,393,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

25.     On November 19, 2013, Fiat SpA (the predecessor to FCA) filed a Monthly Report with the SEC.  Therein, the Company reported monthly sales for October 2013, and announced total sales of 1,474,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

26.     On December 18, 2013, Fiat SpA (the predecessor to FCA) filed a Monthly Report with the SEC.  Therein, the Company reported monthly sales for November 2013, and announced total sales of 1,507,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

27.     On January 17, 2014, Fiat SpA (the predecessor to FCA) filed a Monthly Report with the SEC.  Therein, the Company reported monthly sales for December 2013, and announced total sales of 1,623,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

28.     On February 18, 2014, Fiat SpA (the predecessor to FCA) filed a Monthly Report with the SEC.  Therein, the Company reported monthly sales for

January 2014, and announced total sales of 1,220,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

29.    On March 19, 2014, Fiat SpA (the predecessor to FCA) filed a Monthly Report with the SEC.  Therein, the Company reported monthly sales for February 2014, and announced total sales of 1,405,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

30.    On April 22, 2014, Fiat SpA (the predecessor to FCA) filed a Monthly Report with the SEC.  Therein, the Company reported monthly sales for March 2014, and announced total sales of 1,807,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

31.    On May 19, 2014, Fiat SpA (the predecessor to FCA) filed a Monthly Report with the SEC.  Therein, the Company reported monthly sales for April 2014, and announced total sales of 1,676,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

32.    On June 18, 2014, Fiat SpA (the predecessor to FCA) filed a Monthly Report with the SEC.  Therein, the Company reported monthly sales for May 2014, and announced total sales of 1,924,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

33.    On July 21, 2014, Fiat SpA (the predecessor to FCA) filed a Monthly Report with the SEC.  Therein, the Company reported monthly sales for June 2014,

and announced total sales of 1,712,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

34.    On September 21, 2014, Fiat SpA (the predecessor to FCA) filed a Monthly Report with the SEC.  Therein, the Company reported monthly sales for August 2014, and announced total sales of 1,743,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

35.    On October 29, 2014, FCA filed a Form 6-K with the SEC.  Therein, the Company reported nine months ended September 30, 2014 total sales of 633,000 vehicles for the Company's "NAFTA" region, which includes the U.S. and Canada.

36.    On December 3, 2014, FCA filed a Form 6-K with the SEC.  Therein, the Company reported "U.S. sales of 170,839 units, a 20 percent increase compared with sales in November 2013 (142,275 units)."  The Company also stated that it "extended its streak of year-over-year sales gains to 56-consecutive months."

37.    On January 5, 2015, FCA issued a press release entitled "FCA US LLC Reports December 2014 U.S. Sales Increased 20 Percent – Best December Sales in a Decade; Full-Year Sales Up 16 Percent – Strongest Annual Sales Since 2006."  Therein, the Company reported "U.S. sales of 193,261 units, a 20 percent increase compared with sales in December 2013 (161,007 units)."  The Company

also stated that it "extended its streak of year-over-year sales gains to 57-consecutive months."

38.    On January 28, 2015, FCA published its fourth quarter financial results in a Form 6-K filed with the SEC.  Therein, the Company stated reported total NAFTA sales of 2,459,000 vehicles for fiscal year 2014, a purported 15% increase over 2013.

39.    On February 3, 2015, FCA issued a press release entitled "FCA US LLC Reports January 2015 U.S. Sales Increased 14 Percent; Best January Sales Since 2007."  Therein, the Company reported "U.S. sales of 145,007 units, a 14 percent increase compared with sales in January 2014 (127,183 units)."  The Company also stated that it "extended its streak of year-over-year sales gains to 58-consecutive months."

40.    On March 3, 2015, FCA issued a press release entitled "FCA US LLC Reports February 2015 U.S. Sales Increased 6 Percent; Best February Sales Since 2007."  Therein, the Company reported "U.S. sales of 163,586 units, a 6 percent increase compared with sales in February 2014 (154,866 units)."  The Company also stated that it "extended its streak of year-over-year sales gains to 59-consecutive months."

41.    On March 5, 2015, FCA filed its Annual Report on Form 20-F for the 2014 fiscal year.  Therein, the Company reported total NAFTA sales of 2,459,000

units, including 2,091,000 in U.S. sales.

42.     On April 1, 2015, FCA issued a press release entitled "FCA US LLC Reports March 2015 U.S. Sales Increased 2 Percent; Best March Sales Since 2007." Therein, the Company reported "U.S. sales of 197,261 units, a 2 percent increase compared with sales in March 2014 (193,915 units)." The Company also stated that it "extended its streak of year-over-year sales gains to 60-consecutive months."

43.     On April 29, 2015, FCA announced its first quarter 2015 results in a Form 6-K filed with the SEC. Therein, the Company reported total NAFTA sales of 587,000 vehicles for the quarter.

44.     On May 1, 2015, FCA issued a press release entitled "FCA US LLC Reports April 2015 U.S. Sales Increased 6 Percent; Best April Sales Since 2007." Therein, the Company reported "U.S. sales of 189,027 units, a 6 percent increase compared with sales in April 2014 (178,652 units), and the group's best April sales since 2007." The Company also stated that it "extended its streak of year-over-year sales gains to 61-consecutive months."

45.     On June 2, 2015, FCA issued a press release entitled "FCA US LLC Reports May 2015 U.S. Sales Increased 4 Percent; Best May Sales Since 2005." Therein, the Company reported "U.S. sales of 202,227 units, a 4 percent increase compared with sales in May 2014 (194,421 units), and the group's best May sales

since 2005." The Company also stated that it "extended its streak of year-over-year sales gains to 62-consecutive months."

46. On July 1, 2015, FCA issued a press release entitled "FCA US LLC Reports June 2015 U.S. Sales Increased 8 Percent; Best June Sales Since 2006." Therein, the Company reported "U.S. sales of 185,035 units, an 8 percent increase compared with sales in June 2014 (171,086 units), and the group's best June sales since 2006." The Company also stated that it "extended its streak of year-over-year sales gains to 63-consecutive months."

47. On July 30, 2015, FCA announced its second quarter 2015 results in a Form 6-K filed with the SEC. Therein, the Company reported total NAFTA sales of 682,000 vehicles for the quarter.

48. On August 3, 2015, FCA issued a press release entitled "FCA US LLC Reports July 2015 U.S. Sales Increased 6 Percent; Best July Sales Since 2005." Therein, the Company reported "U.S. sales of 178,027 units, a 6 percent increase compared with sales in July 2014 (167,667 units), and the group's best July sales since 2005." The Company also stated that it "extended its streak of year-over-year sales gains to 64-consecutive months."

49. On September 1, 2015, FCA issued a press release entitled "FCA US LLC Reports August 2015 U.S. Sales Increased 2 Percent; Best August Sales Since 2002." Therein, the Company reported "U.S. sales of 201,672 units, a 2 percent

increase compared with sales in August 2014 (198,379 units), and the group's best August sales since 2002." The Company also stated that it "extended its streak of year-over-year sales gains to 65-consecutive months."

50.     On October 1, 2015, FCA issued a press release entitled "FCA US LLC Reports September 2015 U.S. Sales Increased 14 Percent; Best September Sales Since 2000." Therein, the Company reported "U.S. sales of 193,019 units last month, a 14 percent increase compared with sales in September 2014 (169,890 units), and the company's best September sales since 2000." The Company also stated that it "extended its streak of year-over-year sales gains to 66-consecutive months."

51.     On October 28, 2015, FCA announced its third quarter 2015 results in a Form 6-K filed with the SEC. Therein, the Company reported total NAFTA sales of 674,000 vehicles for the quarter.

52.     On November 3, 2015, FCA issued a press release entitled "FCA US LLC Reports October 2015 U.S. Sales Increased 15 Percent; Best October Sales Since 2001." Therein, the Company reported "U.S. sales of 195,545 units last month, a 15 percent increase compared with sales in October 2014 (170,480 units), and the company's best October sales since 2001." The Company also stated that it "extended its streak of year-over-year sales gains to 67 consecutive months."

53.     On December 1, 2015, FCA issued a press release entitled "FCA US

LLC Reports November 2015 U.S. Sales Increased 3 Percent; Best November in 15 years." Therein, the Company reported "U.S. sales of 175,974 units, a 3 percent increase compared with sales in November 2014 (170,839 units), and the group's best November sales since 2000." The Company also stated that it "extended its streak of year-over-year sales gains to 68-consecutive months."

54.    On January 5, 2016, FCA issued a press release entitled "FCA US LLC Reports November 2015 U.S. Sales Increased 3 Percent; Best November in 15 years." Therein, the Company reported "U.S. sales of 217,527 units, a 13 percent increase compared with sales in December 2014 (193,261 units), and the group's best December sales ever." The Company also stated that it "extended its streak of year-over-year sales gains to 69 consecutive months."

55.    On January 27, 2016, FCA announced its fourth quarter and full year 2015 results in a Form 6-K filed with the SEC. Therein, the Company reported total NAFTA sales of 2,624,000 vehicles for the year.

56.    On February 2, 2016, FCA issued a press release entitled "FCA US LLC Reports January 2016 U.S. Sales Increased 7 Percent; Best January Sales Since 2007." Therein, the Company reported "U.S. sales of 155,037 units, a 7 percent increase compared with sales in January 2015 (145,007 units), and the group's best January sales in nine years." The Company also stated that it "extended its streak of year-over-year sales gains to 70-consecutive months."

57.     On February 29, 2016, FCA filed its Annual Report on Form 20-F for the 2015 fiscal year.   Therein, the Company reported total NAFTA sales of 2,624,000 units, including 2,244,000 in U.S. sales.

58.     On March 1, 2016, FCA issued a press release entitled "FCA US LLC Reports February 2016 U.S. Sales Increased 12 Percent; Best February Sales Since 2006."   Therein, the Company reported "U.S. sales of 182,879 units, a 12 percent increase compared with sales in February 2015 (163,586 units), and the group's best February sales in 10 years."   The Company also stated that it "extended its streak of year-over-year sales gains to 71-consecutive months.."

59.     On April 1, 2016, FCA issued a press release entitled "FCA US LLC Reports March 2016 U.S. Sales Increased 8 Percent; Best March Sales Since 2006."   Therein, the Company reported "U.S. sales of 213,187 units, a 8 percent increase compared with sales in March 2015 (197,261 units), and the group's best March sales in a decade."

60.     On April 26, 2016, FCA announced its first quarter 2016 results in a Form 6-K filed with the SEC.   Therein, the Company reported total NAFTA sales of 643,000 vehicles for the units.

61.     On May 3, 2016, FCA issued a press release entitled "FCA US LLC Reports April 2016 U.S. Sales Increased 6 Percent; Best April Sales Since 2005." Therein, the Company reported "U.S. sales of 199,631 units, a 6 percent increase

compared with sales in April 2015 (189,027 units), and the group's best April sales in 11 years."

62.    On June 1, 2016, FCA issued a press release entitled "FCA US LLC Reports May 2016 U.S. Sales Increased 1 Percent; Best May Sales Since 2005." Therein, the Company reported "U.S. sales of 204,452 units, a 1 percent increase compared with sales in May 2015 (202,227 units), and the group's best May sales in 11 years."

63.    On July 1, 2016, FCA issued a press release entitled "FCA US LLC Reports June 2016 U.S. Sales Increased 7 Percent; Best June Sales Since 2005." Therein, the Company reported "U.S. sales of 197,073 units, a 7 percent increase compared with sales in June 2015 (185,035 units), and the group's best June sales in 11 years."

64.    The above statements contained in ¶¶24-63 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company had not achieved the sales growth originally communicated to investors; (2) that the Company did not in fact achieve

a 75 month streak of monthly vehicle sales growth (on a year over year basis); and (3) that, as a result of the foregoing, Defendants' statements about FCA's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

65.     The truth began to emerge on or around January 12, 2016, when a FCA car dealer filed a lawsuit accusing the Company of improperly inflating vehicle sales numbers by reporting unsold vehicles as sold and then reversing those sales during the following month.

66.     Following the news reports of the FCA dealer lawsuit, the Company shares declined $0.66 per share, or more than 8%, to close at $7.53 per share on January 14, 2016.

67.     Then on July 18, 2016, several media outlets reported that both the Department of Justice and the Securities and Exchange Commission were investigating FCA's sales practices. On this news shares of FCA declined sharply in value.

68.     On July 26, 2016, FCA announced that it had adjusted the way it discloses monthly U.S. vehicle sales, professing that the Company's "75-month streak of U.S. monthly vehicle sales growth" was false and actually ended at 40 months in September 2013. The Company announced that it would adjust its

monthly totals to take into account sales that did not actually go through. Until now, dealers could report a vehicle sold, even if there was no actual customer for it. Days later, after the start of a new month, the dealer could then "unwind," or undo, the sale. On July 26, 2016, FCA announced that it would adjust its monthly sales totals to account for sales that are undone.

69.     On this news shares of FCA declined sharply in value.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired FCA's, and its predecessor companies', securities between October 16, 2013, and July 18, 2016, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

71.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FCA's common stock actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of

members in the proposed Class.  Millions of FCA shares were traded publicly during the Class Period on the NYSE.  As of August 12, 2016, FCA had nearly 900,000,000 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by FCA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

72.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

73.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

74.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of FCA; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

75.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

76.     The market for FCA's securities was open, well-developed and efficient at all relevant times.   As a result of these materially false and/or misleading statements, and/or failures to disclose, FCA's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired FCA's securities relying upon the integrity of the market price of the Company's securities and market information relating to FCA, and have been damaged thereby.

77.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of FCA's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary

to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about FCA's business, operations, and prospects as alleged herein.

78.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about FCA's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

79.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

80.   During the Class Period, Plaintiff and the Class purchased FCA's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

81.   As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding FCA, his/her control over, and/or receipt and/or modification of FCA's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning FCA, participated in the

fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

82.    The market for FCA's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, FCA's securities traded at artificially inflated prices during the Class Period.  On October 19, 2015, the Company's stock price closed at a Class Period high of $16.47 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of FCA's securities and market information relating to FCA, and have been damaged thereby.

83.    During the Class Period, the artificial inflation of FCA's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about FCA's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of FCA and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading

statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

84.     At all relevant times, the market for FCA's securities was an efficient market for the following reasons, among others:

(a)     FCA stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, FCA filed periodic public reports with the SEC and/or the NYSE;

(c)     FCA regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     FCA was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

85.     As a result of the foregoing, the market for FCA's securities promptly digested current information regarding FCA from all publicly available sources

and reflected such information in FCA's stock price. Under these circumstances, all purchasers of FCA's securities during the Class Period suffered similar injury through their purchase of FCA's securities at artificially inflated prices and a presumption of reliance applies.

86.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

87.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent

certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of FCA who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

88.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase FCA's securities at artificially inflated prices.  In furtherance of this unlawful

scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

90.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FCA's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

91.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about FCA's financial well-being and prospects, as specified herein.

92.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of FCA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material

facts and/or omitting to state material facts necessary in order to make the statements made about FCA and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

93.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

94.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FCA's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

95.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of FCA's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information

that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired FCA's securities during the Class Period at artificially high prices and were damaged thereby.

96.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that FCA was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their FCA securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

97.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

98.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

99.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.   The Individual Defendants acted as controlling persons of FCA within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

101.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is

presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

102.   As set forth above, FCA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.


Dated:  September 26, 2016              Respectfully submitted,

**CAFFERTY CLOBES**
**MERIWETHER & SPRENGEL**
**LLP**

By:<u>/s/Patrick E. Cafferty</u>
Patrick E. Cafferty
101 North Main Street, Suite 565
Ann Arbor, MI  48104
(734)769-2144
(734) 769-1207 (fax)
pcafferty@caffertyclobes.com
Mich. Bar No. P35613


**GLANCY PRONGAY &**
**MURRAY LLP**

By: <u>/s/Lesley F. Portnoy</u>
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
(310) 201-9150
(310) 201-9160 (fax)
lportnoy@glancylaw.com

*Attorneys for Plaintiff*

## SWORN CERTIFICATION OF PLAINTIFF

## FIAT CHRYSLER AUTOMOBILES N.V. SECURITIES LITIGATION

I, Odus E. Ross, certify that:

1.       I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.       I did not purchase **FIAT CHRYSLER AUTOMOBILES N.V. ,**   the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.       I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.       My transactions in **FIAT CHRYSLER AUTOMOBILES N.V.. ,** during the Class Period set forth in the Complaint are as follows:

(See Attached Transactions)

5.       I have not served as a representative party on behalf of a class under this title during the last three years, except for the following:

6.       I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

9/22/2016

_____
Date

DocuSigned by:

*Odus E. Ross, Jr.*

C6BBB7F381D045D...

_____
Odus E. Ross

**Odus Ross's Transactions in**
**Fiat Chrysler Automobiles N.V. (FCAU)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 05/21/2015 | Bought | 500 | $15.7500 |